**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MICHAEL CHEW #180-461
               Plaintiff          :

               v.            :   CIVIL ACTION NO. DKC-13-2115

KATHLEEN GREEN, WARDEN      :
PAUL WISENGOFF
GREGORY BIRCH           :
BRUCE BOZMAN
DENISE GELSINGER, FACILITY   :
  ADMINISTRATOR
SCOTT ROWE, CORRECTIONAL CASE  :
  MANAGEMENT SPECIALIST[1]
HAMILTON, GANG INTEL      :
JAMES E. TICHNELL, CORRECTIONAL
  CASE MANAGEMENT MANAGER  :
            Defendants

**MEMORANDUM OPINION**

On July 12, 2013,[2] self-represented Plaintiff Michael Chew, a Maryland Division of Correction prisoner currently housed at Jessup Correctional Institution ("JCI"), signed a civil rights complaint pursuant to 42 U.S.C. § 1983, seeking money damages and injunctive relief mandating he be assigned to protective custody and a single cell for the remainder of his incarceration. In his Complaint, as amended, Chew alleges that correctional personnel harassed him by conducting numerous cell searches and confiscating his legal documents; he has been attacked three times by fellow prisoners since September 10, 2010, and by an "Officer Morris" on April 25, 2013;[3] and he is threatened with further harm both by correctional personnel and other prisoners because he has been labeled a "snitch." In addition to money damages, Chew

---

[1] The Clerk shall amend the docket to reflect the full spelling of this Defendant's name.

[2] The Complaint was received and docketed by the Clerk on July 22, 2013.

[3] "Morris" is not named a Defendant in this action. An Internal Investigation Unit ("IIU") investigation into this allegation found no officer named "Morris" assigned to the area on the date in question, and further found Plaintiff sustained no injury from the alleged attack. (ECF No. 28-15 at 3).

seeks injunctive relief mandating an end to the cell searches, a return of his documents, the removal of allegedly fabricated reports from his prison base file, and protective custody assignment to include a single cell.  (ECF No. 1 at 4; ECF No. 9).[4]  Counsel for Defendants has moved for dismissal or for summary judgment (ECF No. 28), and Plaintiff has filed an opposition response.[5]  (ECF No. 51).  A hearing is not needed to resolve the case.  *See* Local Rule 105.6 (D. Md. 2014).

Background

Plaintiff claims that while housed at Western Correctional Institution ("WCI"), he was assaulted by his cellmate.  He states that this September 10, 2010 incident occurred after his cellmate, Quentin Cephus, "saw papers that I was a rat and…snitch on his comrades, the Black Gorilla Family gang."  (ECF No. 1 at 4).  He implies that beginning in 2006, he complained to case managers and other DOC personnel that he was in danger from prison gangs, and has continued to seek protection from these gangs through placement of protective custody and assignment to a single cell.  He states that despite his attack by Cephus and his ongoing requests

---

[4] Citation to the record contained in this Memorandum Opinion reflects the pagination of the court electronic docketing system.

[5] Plaintiff requested additional time to oppose the pending dispositive motion and claimed that his legal materials had been taken away while he was housed at ECI.  The request contained no information as to when this alleged confiscation occurred, nor who took the materials. (ECF No. 33).  Defendants' court-ordered Response to the claim of confiscated legal materials, which includes declarations by Litigation Coordinator Michelle M. Switalski and Case Manager Evan Lane, indicates that Plaintiff's property was twice confiscated, on August 2 and October 23, 2013.  The material taken included only a pair of broken shower shoes, a book containing the names, addresses and identification numbers of other prisoners, later returned to Plaintiff, a soap dish, a sweatshirt and thermal top, and 18 books.  At the time of his transfer from MCI to ECF on October 23, 2013, Plaintiff was in possession of two boxes of paperwork in excess of allowable property limits, both boxes were returned to him on October 25, 2013.  (ECF No. 38-1 at p. 2-4; 38-2 at. 2; and 38-4 at. 42).  In his reply to the Response, Plaintiff indicates he refused on October 25, 2013, to meet with corrections personnel or sign for a box of property that corrections personnel attempted to give him, claiming the box did not contain all of his property.  (ECF No. 39 at 2).

The question of property confiscation is before the court merely to ascertain whether Plaintiff was denied access to legal material needed to oppose the pending dispositive motion.  There is no showing that Plaintiff's access to these materials occurred or, if it did occur, that corrections personnel did not attempt to resolve the problem.  Plaintiff has filed an opposition response with numerous exhibits.  (ECF No. 51).  Nothing further is required here.  Should he seek to litigate concerning access to personal property or legal materials, Plaintiff may do so in a separate lawsuit following the completion of administrative remedies.

for protection from gang members, DOC personnel have refused to acknowledge that he is in imminent danger, and instead have "kept [him] on disciplinary segregation under false pretenses for seven years." Plaintiff further claims that "[b]eing labeled a snitch isolated [him]" from other prisoners. Plaintiff states he is in his mid-fifties and came into the DOC in 1985, where he was housed in the general population until January 10, 2006. (ECF No. 1 at 5).

Plaintiff states that in January of 2006, while housed at Eastern Correctional Institution ("ECI"), he asked Defendant Wisengoff for protection from BGF because they were extorting him. He claims Wisengoff then showed Plaintiff's statement to Ricky McDonald, a member of the BGF. As a result, Plaintiff had to choose between fighting BGF members or "go[ing] on lockup." (ECF No. 1 at 6).

Plaintiff claims his request for protection from BGF was rejected by ECI Case Managers Birch in May of 2006 and Bozman in August of 2006. *Id.* at 6-8. He states Bozman nearly attacked him during a September, 2007 meeting with Captain Holmes. *Id.* at 8. He also claims that during this time his repeated requests to Defendant Green concerning threats on his life were met with indifference. *Id.* at 12.

After a transfer to Roxbury Correctional Institution ("RCI"), Plaintiff requested protective custody status from Case Manager Gelsinger. Gelsinger denied his request in November of 2007. Plaintiff claims that Gelsinger asked him to sign a "body waiver" exculpating her from liability should Plaintiff be attacked, and when he refused, Plaintiff was placed on disciplinary segregation. *Id.* at 9.

Plaintiff next was housed at JCI, where in September of 2008, Defendant Rowe denied his request for protection from Ronnie Jones (an enemy previously housed at ECI) and loudly told Plaintiff to "stop snitching." *Id.* at 9. Plaintiff was found guilty of an infraction in February

of 2009 because he refused to accept housing in general population.  Plaintiff claims that at this time, Rowe again declined to help him obtain protective custody, despite Plaintiff's statement that "case management wanted to see [him] physically harmed."  *Id.* at 10.

Plaintiff states that in December of 2008, while still at JCI, he met with Defendant Hamilton concerning Ronnie Jones and "L," a member of the Bloods gang who threatened Plaintiff because of Plaintiff's assistance to a former gang member.  *Id.*  Plaintiff claims that in February of 2009, Hamilton agreed to place information in Plaintiff's base file validating his endangerment from gangs, but failed to do so.  Plaintiff claims that in March and April of 2009, Defendant Tichnell denied his placement on protective custody after determining that Plaintiff was merely attempting to force a transfer from JCI.  *Id.*

On September 10, 2010, the incident with cellmate Cephus occurred.  Both men were injured and both were charged and convicted of institutional rules violations.  *Id.* at 4; ECF No. 1-1 at 5-9; ECF No. 28-3 at 42, 58; ECF No. 28-4; ECF No. 28-5.[6]

In October of 2012, Plaintiff returned to ECI, where he renewed his requests for protective custody status and complained to Green about "14 false documents in my prison base file and [Maryland Correctional Institution-Hagerstown] Warden Webb's decision."  He complains that Green did nothing and as a result he has remained on disciplinary segregation.  *Id.* at 12-13.

Defendants, who argue that the limitations period has expired with regard to many of his claims prior to July of 2010, present a different version of events.   On September 27, 2010, while housed at WCI, Plaintiff wrote a letter to the Department of Public Safety & Correctional

---

[6] Counsel for Defendants indicated Plaintiff would be provided an opportunity to hear the audio recording of this adjustment proceeding.  (ECF No. 28 at 5, n. 2).  There is no indication that Plaintiff was not afforded this opportunity; in any event, the fact that both men received adjustment convictions resulting from the incident is not material to the outcome of this case.

Services Internal Investigative Unit ("IIU") alleging that he had been assaulted by his cellmate, Quentin Cephus, on September 10, 2010. (ECF No. 28-3, IIU Report of Michael Chew, CIR, # 103501377, at 7).  Plaintiff claimed that he was awakened by "something hitting the bunk" and observed Cephus reading a note.  Cephus allegedly accused him of being a rat and spat on him. Plaintiff claimed that he was struck on the left side of his head and eye, then tried to kick Cephus, who had bitten his hand.  *Id.*

Plaintiff reported the incident to B Tier Correctional Officer Neil W. Alexander, Jr., who reported hearing a call for assistance coming from cell #18.  Alexander reported observing Plaintiff "standing in front of the cell window in the back of the cell, and I could see he had a bloody lip."  He also noted that Cephus was standing in front of Plaintiff.  *Id.*  When the inmates were questioned about what was going on, both inmates shrugged their shoulders.  *Id.* at 8.  Both prisoners were handcuffed, taken to the medical department, and examined by James Wilt, RN. *Id.*  Plaintiff had sustained slight swelling to the left eye, a bloody lip, and a small bite mark over the left eye on his forehead.  (ECF No. 28-4 at 1, Medical Records of Michael Chew, #180-461). He received a tetanus vaccination and it was noted that orders for HIV and Hepatitis testing were needed.  The bite mark was cleansed and dressed.  *Id.* at 11.  Ongoing care was provided (*id.* at 4-16), and nothing suggests the injuries have not resolved.

A check of the OBSCIS Alerts and OBSCIS II Classification Data system[7] reveals that neither Plaintiff nor Cephus is a validated member of a Security Threat Group (gang).  Plaintiff claims that a review of the adjustment hearing will show that Cephus' comments will support his

---

[7] OBSCIS is the Offender Based State Correctional Information System, a statewide database used by Maryland correctional institutions to assist in identifying prisoners and keeping track of pertinent information.  *See Muhammad v. Shearin,* Civil Action No. ELH-13-1072 (D. Md.), ECF No. 16, Ex. 2, Declaration, J. Michael Stouffer, Deputy Secretary of Operations at ¶¶ 3-4.

claim Cephus was a gang member.  (ECF No. 1 at 4-5).  The audiotape of the hearing reveals

that Cephus did not admit the incident was gang-related, but that Plaintiff:

> got up we had some words he kicked me in my leg and I defended
> myself that's it.  He planned all this out so he could get this lawsuit
> … that's all he do is file ARPs and file lawsuits…He probably…
> he might be ready to go home he trying to go home to get some
> money.  Far as officers they didn't see nothing."

(ECF No. 28-5 at 5:45-6:20).  The hearing officer found both men guilty of violating Rule 102

and imposed a sanction of 150 days of segregation.  (ECF No. 28-3 at 42 and 58).

Defendants also provide details concerning Plaintiff's challenges to the denial of his

request to be assigned to protective custody.  Specifically, Plaintiff complains that on July 8,

2010, Defendant Tichnell prepared a routing slip ordering his assignment to general population,

even after Tichnell was made aware of "fabricated reports" in Plaintiff's base file.  ECF No. 1 at

11.   Case notes, however, indicate that Plaintiff, who was routinely reviewed by case

management while housed at WCI, remained assigned to disciplinary segregation throughout his

time at WCI because he kept incurring new rule violations.  ECF No. 28-7 at 1-6.

On May 13, 2010, an Administrative Segregation Investigative Report was conducted in

response to Plaintiff's claim that he was not safe in general population due to problems with

Security Threat Groups throughout the DOC.  (ECF No. 28-8, Case Management Assignment

Sheets of Michael Chew, at 82-84).   The investigator concluded that Plaintiff's file and

testimony should be reviewed at the case management team review.  *Id*.  On May 17, 2010, the

case management team recommended that Plaintiff be removed from administrative segregation

and continued on disciplinary segregation assignment because he "failed to provide any kind of

information that would make the inmate suitable for [protective custody] status.  Documentation

indicates that this is a classic manipulation."  *Id*. at 83.  Attached to the Notice of Assignment to

Administrative Segregation were documents including an e-mail from then Case Manager Denise Gelsinger, dated February 13, 2008, stating that review of the base file contained nothing to support Plaintiff's claim of a gang hit.  *Id*. at 85.  Additionally, Gelsinger noted that Plaintiff had housing problems "wherever he goes" and she believed that he wanted to be assigned to administrative segregation for the rest of his life.[8]  *Id*.  A letter from Acting Commissioner John A. Rowley to Ms. Cheryll- Vanessa Chew, dated January 5, 2007, notes:

> After investigating your concerns, we have found that Mr. Chew remains on disciplinary segregation for continuously refusing housing…  He repeatedly refuses to cooperate with case management in naming any enemies which makes it very difficult to determine where the threats he has reported originate.  If Mr. Chew does not provide specific details, his case manager cannot determine what institution can best meet his needs.

*Id*. at 86; *see also* ECF No. 28-9 (Correspondence from Commissioner J. Michael Stouffer to Congressman Elijah Cummings, dated July 12, 2010).

On March 31, 2010, Plaintiff filed Grievance # 2010629, with the Inmate Grievance Office ("IGO") complaining that his request for assignment to protective custody was improperly denied on March 25, 2010.  (ECF No. 28-10 at 8, OAH Decision in *Chew v. Maryland Division of Correction*, OAH Case No. DPSC-IGO-005V-10-19022, dated September 2, 2010).  In a hearing conducted on June 8, 2010, the Office of Administrative Hearings ("OAH") examined Maryland's Administrative Procedure Act, the General Regulations of the IGO, and the OAH Rules of Procedure to determine whether "the DOC arbitrarily and capriciously, or in a manner not consistent with the law, denied the Grievant's March 25, 2010 request to be placed in protective custody."  Following testimony given by Plaintiff and prison officials and after examining various DOC records, the ALJ made findings of fact, including the following:

---

[8] Plaintiff has been incarcerated since his May 13, 1985 convictions in the Circuit Court for Charles County for first-degree murder, attempted first-degree rape, and related charges.   *See http://casesearch.courts.state.md.us /inquiry/inquiryDetail.jis?caseId=08K85000135&loc=64&detailLoc=K*.

Since January 2006, the Grievant has been on either disciplinary segregation for refusing to accept housing assignments in the general population at ECI, JCI [Jessup Correction Institution] and WCI, or on administrative segregation pending investigation into his allegations that he is under threat from members of various gangs. . .

At the time of the February 2009 case management review, the Grievant did not identify any specific individuals who had made any threats to his safety. . .

On or around March 27, 2009, the Grievant was taken off administrative segregation and ordered to report to a housing unit in WCI's general population. At that time, the Grievant refused the housing assignment. As a result, he received a disciplinary notice, and, after an adjustment proceeding was placed on disciplinary segregation for 270 days. . .

On or around March 2009, the Grievant wrote a letter to the Warden of WCI, in which he explained the basis for his refusal to accept the housing assignment. In the letter, the Grievant indicated that he was having problems with gangs," but did not identify any specific individuals who threatened him . . .

The Warden directed that an investigation be conducted on the Grievant's claims and that the Grievant be placed in administrative segregation pending the outcome of the investigation. . .

Case management reviews were conducted in connection with the investigation of the Grievant's claims on March 30, 2009 and April 27, 2009. The grievant did not provide the case management teams with the names of any specific individuals or gangs that were threatening him. . .

Throughout 2009 and 2010, the Grievant continued to refuse housing assignments in the general population, citing fear for his safety. Sometime [sic] in March 2010, the Grievant renewed his request to the Warden at WCI to be placed in protective custody. On March 25, 2010, the warden denied the request on the grounds that the Grievant did not meet the criteria for protective custody. . . .The Grievant argued that "His concern for his safety is genuine and that the DOC's failure to follow-up on his complaints demonstrates a deliberate indifference to and reckless disregard for his safety…From the Grievant's perspective, it is unreasonable of the DOC to essentially take a position of non-action *until* the Grievant is beaten or otherwise injured." The DOC took the position that the Grievant has never provided it with specific names of individuals, or the details of any specific threats that were made to him. As a result of the Grievant's failure to do so, it is not possible for the DOC to verify whether the threat is real; at this point, the DOC would be acting entirely

on the Grievant's say so, an outcome that is not preferable to the DOC, which has larger concerns of overall institutional security.  From the DOC's perspective, the Grievant is attempting to manipulate his way into a 'favorable' housing assignment, and if DOC were to acquiesce to his request without any concrete demonstration that he is actually under threat, it would reward him for his manipulation. . .

To put it bluntly, it is simply not enough for the Grievant to say that he is being threatened for the DOC to put him into protective custody.  The DOC must be able to make a reasonable assessment that the Grievant is in need of the security offered by placement on protective custody.  In order to make that assessment, the DOC must have some information from which it can conduct a meaningful investigation into Grievant's claim.  The Grievant's nebulous and conclusory assertions that he is being 'threatened' are insufficient for the DOC to make the necessary assessment.

ECF No. 28-10 at 3-9.

Defendants argue that Plaintiff has repeatedly filed Requests for Administrative Remedies ("ARPs") against correctional staff and fellow prisoners who allegedly have threatened to harm him.  These ARPs were invariably dismissed on the basis that Plaintiff was "attempting to manipulate housing through the remedy process."  (ECF No. 28-11, Declaration of Sergeant Steven L. Beeman, with attachments).  Defendants claim that Plaintiff has refused to provide any information to corrections staff to assist them in investigating his complaints and substantiate his claims.  (ECF No. 28-12, Declaration of ECI Litigation Coordinator Michelle M. Switalski, with attachments, at 1, ¶ 6).

An August 1, 2012, assignment sheet notes that Plaintiff has been housed at every institution within the DOC except the Maryland Correctional Institution – Jessup.  (ECF No. 28-8 at 21).  Defendants note that Plaintiff's Management Assignment Sheets reveal that he has raised the same allegations at WCI, Maryland Correctional Training Center, and Maryland Correctional Institution – Hagerstown ("MCI-H"). (*Id.* at 21, 24-25, 27-28).  On August 1, 2012, while housed at MCI-H, case management personnel removed Plaintiff from administrative

segregation and assigned him to general population.  (*Id*. at 21).  They also placed him on the transfer list to any institution housing medium security level inmates and in the rationale section noted:

> Inmate requested [protective custody] upon arrival; He has been housed at every Med Sec institution except MCI-J and has feared for his safety and blamed staff at [sic] different facilities for his problems; inmate admits that no one has threatened him but continues to blame staff for cover ups; He continues to give allegations and speculation only that 'I'm not playing Russian roulette with his life' that he cannot be housed; team believed inmate is manipulating housing at this time.

*Id*.

Plaintiff returned to ECI on October 4, 2012, and promptly requested protection from unspecified gangs and complained to Defendant Green about "false documents" in his base file. He repeatedly refused housing, for which he was found guilty of rule violations and assigned to disciplinary segregation, where he remained until September 17, 2013.  (ECF No. 28-12 at ¶4; 28-8 at 6, 11-12, and 14).  Defendants contend that intelligence staff has been unable to obtain any information from Plaintiff about his safety concerns because he continues to refuse to speak to them or to provide any names or specific information to assist investigative personnel in investigating his claims.  (ECF No. 17-4 of Response to Show Cause, Declaration of Lieutenant William Clayton, at ¶4).  It appears that Plaintiff has again been transferred, this time to JCI.

## Standard of Review

Defendants have moved to dismiss or, in the alternative, for summary judgment.  "The purpose of a Rule 12(b)(6) motion [to dismiss] is to test the sufficiency of a complaint." *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010) (citation omitted).  A Rule 12(b)(6) motion constitutes an assertion by the Defendant that, even if the facts that Plaintiff alleges are true, the Complaint fails, as a matter of law, "to state a claim upon which relief can be granted."

Fed R. Civ. P. 12(b)(6).  Therefore, in considering a motion to dismiss under Rule 12(b)(6), a court must "accept[ ] as true the well-pled facts in the complaint and view[ ] them in the light most favorable to the plaintiff."  *Brockington v. Boykins*, 637 F.3d 503, 505 (4th Cir. 2011) (citation omitted).

Ordinarily, a court cannot consider matters outside the pleadings or resolve factual disputes when ruling on a Rule 12(b)(6) motion.  *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  If the court does consider matters outside the pleadings, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d); *see also Finley Lines Joint Protective Bd. Unit 200 v. Norfolk S. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

This court deems it appropriate to consider the extraneous materials, as they are likely to facilitate disposition of this case.[9] Accordingly, Defendants' motion shall be treated as a motion for summary judgment.

Rule 56(a) of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact

---

[9] A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it."  5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d Ed. 2004).  But, this discretion "should be exercised with great caution and attention to the parties' procedural rights."  *Id.* at 149.  In general, courts are guided in this determination by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary.  *Id.* at 165–67.  For reasons apparent herein, discovery is not required to resolve this case.

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The Supreme

Court has clarified that this does not mean that any factual dispute will defeat the motion.  "By

its very terms, this standard provides that the mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest

upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football*

*Club,Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P.

56(e)).  The court must "view the evidence in the light most favorable to . . . the nonmovant, and

draw all reasonable inferences in her favor without weighing the evidence or assessing the

witnesses' credibility."  *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir.

2002). At the same time, the court also must abide by the "affirmative obligation of the trial

judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*,

346 F.3d at 526 (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)) (internal

quotation marks omitted) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

Plaintiff's claims of failure to protect, falsification of prison records, and harassment shall be

examined in light of this standard of review.

**Analysis**

Preliminarily, the court shall examine Defendants' affirmative defenses to suit.[10] Counsel seeks dismissal of the claims against several Defendants as the events involving those Defendants occurred more than three years prior to the instant lawsuit. Defendants also contend that the action is barred in part by res judicata and the doctrine of collateral estoppel, and that the claim involving the alleged assault by cellmate Cephus is barred because it was not exhausted using the ARP process.

Limitations Defense

While there is no express period of limitations in the Civil Rights Act, federal courts generally apply the most appropriate state statute of limitations to a claim filed under 42 U.S.C. § 1983. *See Wilson v. Garcia,* 471 U.S. 261 (1985); *Burnett v. Grattan,* 468 U.S. 42 (1984); *Cox v. Stanton,* 529 F.2d 47, 49-50 (4th Cir. 1975). Maryland's general three-year statute of limitations for civil actions is most applicable to the case at bar. *See* Md. Code Ann., Cts. & Jud. Proc., § 5-101. Plaintiff's allegations concerning Defendants Wisengoff, Birch, Bozman, Gelsinger, Rowe and Hamilton accrued more than three years prior to the July 12, 2013 signature date of the Complaint.[11] These Defendants are therefore entitled to dismissal of the claims against them. Defendants Green and Tichnell, whose alleged actions are not barred by the statute of limitations, remain in this case.

---

[10] *See* Fed. R. Civ. P. 8(c)(1) (providing that the statute of limitations, res judicata and estoppel are affirmative defenses); *Jones v. Bock*, 549 U.S. 199, 216 (2007) ("[F]ailure to exhaust is an affirmative defense under the PLRA.").

[11] Under the "prison mail box rule," the Complaint shall be deemed filed as of the signature date, July 12, 2013. *See Houston v. Lack*, 487 U.S. 266 (1988); *United States. v. Dorsey*, 988 F.Supp. 917, 919-20 (D. Md. 1998).

Res Judicata and Collateral Estoppel

Counsel contends that the factual determinations and conclusions reached by the Administrative Law Judge as a result of the formal IGO hearing should preclude reexamination of whether prison officials acted properly in denying Plaintiff's request for protective custody status prior to March of 2010.  Defendants premise this argument on the doctrines of res judicata and collateral estoppel.

The doctrine of res judicata, also known as "claim preclusion," was "designed to protect 'litigants from the burden of relitigating an identical issue with the same party or his privy and [to promote] judicial economy by preventing needless litigation."  *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979)); *see also Montana v. United States*, 440 U.S. 147, 153-54 (1979) (recognizing that res judicata avoids the "expense and vexation attending multiple lawsuits, conserves judicial resources," and avoids "inconsistent decisions").

Under Maryland law, application of res judicata requires satisfaction of three conditions: "(1) the parties in the present litigation are the same or in privity with the parties to the earlier litigation; (2) the claim presented in the current action is identical to that determined or that which could have been raised and determined in the prior litigation; and (3) there was a final judgment on the merits in the prior litigation."  *Cochran v. Griffith Energy Servs., Inc.*, 426 Md. 134, 140 (2012); accord *Powell v. Breslin*, 430 Md. 52, 63-64 (2013).

Res judicata is inapplicable here because, even assuming that the second and third conditions are satisfied, the parties to this case are not "the same or in privity with the parties to the earlier litigation."  *Cochran*, 426 Md. at 140.  The grievance proceeding was not a claim against individual corrections personnel, but rather against the Division of Correction generally. As a grievance, it was construed as a challenge to investigations and reports provided by WCI

staff that led to WCI Warden Morgan's[12] March 25, 2010 denial of Plaintiff's request to be placed on protective custody.  Indeed, when the grievance was heard by the ALJ, the DOC did not require Tichnell, the Warden, or anyone involved in the investigation to appear, either in person or through counsel.  Rather, Plaintiff was opposed by a representative of the DOC.  In this case, however, the DOC is not a party.

To add to the confusion concerning privity, Plaintiff has not specified whether he has sued Tichnell in his official capacity or, alternatively, in his individual capacity, or both.  In some circumstances, Maryland appellate courts have held that an employee and his or her employer are in privity for preclusion purposes.  *See, e.g.*, *deLeon v. Slear*, 328 Md. 569, 587-88, 616 A.2d 380, 388-89 (1992) (in doctor's suit against nurses for submitting complaints to hospital administrators, nurses were in privity with hospital such that doctor's prior defamation suit against hospital barred suit against nurses by res judicata); *Patel v. HealthPlus, Inc.*, 112 Md. App. 251, 684 A.2d 904 (1996) (employee in HMO's billing department was in privity with HMO, and doctor's negligence suit against the employee regarding mishandling of claims for payments for services was barred under res judicata by earlier suit against HMO regarding same payment claims).

The concept of privity is difficult, *see Martin v. American Bancorp. Retirement Plan*, 407 F.3d 643, 651 (4th Cir. 2005), and Maryland law does not always dictate that employer and employee are in privity.  *See Warner v. German*, 100 Md. App. 512, 518-19 (1994) (police officer and employer were not in privity in automobile personal injury action).  The Fourth Circuit has expressed similar principles under federal law. It has said:  "To be in privity with a party to a former litigation, the non-party must be 'so identified in interest with a party to former litigation that he represents precisely the same legal right in respect to the subject matter

---

[12] Morgan is not named as a Defendant in this case.

involved.'" *Martin*, *supra*, 407 F.3d at 651 (citation omitted).   Generally, there are three categories of non-parties who will be considered in privity with a party to the prior action who will therefore be bound by a prior adjudication:   first, a "non-party who controls the original action;" second, a "successor-in-interest to a prior party;" and third, a "non-party whose interests were adequately represented by a party to the original action." *Id.*   This Circuit has held that in a § 1983 suit, a "government employee in his official capacity is not in privity with himself in his individual capacity for purposes of res judicata." *Andrews v. Daw*, 201 F.3d 521, 523 (4th Cir. 2000); *see also Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989).   Given the lack of clarity as to whether Tichnell is named in his individual capacity, the undersigned declines to find that he is in privity with the DOC, and finds that Tichnell is not entitled to the affirmative defense of res judicata with regard to claim preclusion based on the prior state administrative grievance proceeding.

Collateral estoppel, also known as "issue preclusion," is a related doctrine; "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94 (1980).   Collateral estoppel "bars the relitigation of specific issues that were actually determined in a prior action," *Sartin v. Macik*, 535 F.3d 284, 287 (4th Cir. 2008), so long as the "'party against whom [collateral estoppel] is asserted had a full and fair opportunity to litigate'" the issue. *In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 326 (4th Cir. 2004).

Under Maryland law, preclusion principles apply to the judgment of a court which affirms or reverses administrative determinations, *see Esslinger v. Baltimore City*, 622 A.2d 774, 781 (Md. Ct. Spec.App.1993), and a party will be collaterally estopped from relitigating issues

decided in such an adjudication where: (1) the issue raised in the prior action is identical with the issue presented in the action in question; (2) there is a final prior judgment on the merits; and (3) the party against whom estoppel is asserted was a party to the prior litigation.  *See Alston v. Robinson,* 791 F.Supp. 569, 578 (D. Md.1992).   In the context of prison litigation, collateral estoppel has been recognized in cases involving administrative decisions affecting Maryland prisoners.[13]   In such instances, an administrative adjudication may be given collateral estoppel effect where: (1) "the agency was acting in a quasi-judicial capacity"; (2) the issue as to which the defendant seeks to estop the plaintiff "was actually litigated before the agency"; and (3) "resolution of the issue was necessary to the agency's decision."  *Neifert v. Dept. of the Envir.*, 395 Md. 486, 507, 910 A.2d 1100, 1112 (2006); accord *Batson v. Shiflett*, 325 Md. 684, 701-05, 601 A.2d 1191, 1200-02 (1992).  Additionally, the agency must have acted "in a quasi-judicial capacity" when making the determination at issue.  *Neifert*, 395 Md. at 507.

The ALJ's decision was limited to whether WCI officials acted arbitrarily, capriciously, or in a manner inconsistent with the law in denying Plaintiff's March, 2010 request for placement in protective custody.  Defendant Tichnell was Plaintiff's case manager at that time.[14] Plaintiff's sole allegation against Tichnell is that Tichnell ordered his assignment to general population, even after Plaintiff told him such decision would be based on "fabricated reports" in Plaintiff's base file.  The question before this court is whether the ALJ's factual finding, which

---

[13] Although unpublished, the March 29, 2013 Memorandum Opinion issued in *Haskins v. Hawk*, Civil Action No. ELH-11-2000 (D. Md.) (Hollander, J.) is instructive.

[14] Defendant Green, the Warden of ECI, appears to have played no role in this classification decision.

was affirmed by the Circuit Court for Allegany County,[15] should bar further consideration into Tichnell's alleged liability in the context of the instant civil rights action.

Counsel also asks the court to give collateral estoppel effect to the ALJ's factual finding, affirmed by the Circuit Court, that Warden Morgan's March, 2010 decision (based on reports made by prison personnel presumably including Defendant Tichnell) did not place Plaintiff at risk by refusing his requests for placement on protective custody.  Counsel relies principally on *Batts v. Lee*, 949 F. Supp. 1229 (D. Md. 1996).  In *Batts*, the plaintiff, a Maryland state prisoner, alleged that Lee, a correctional officer, had ordered him to dismiss an ARP request that he had filed against another correctional officer. *Id.* at 1231.   Batts claimed that when he refused, Lee retaliated by confining him in isolation in full restraints for over 24 hours.  Batts filed a grievance complaint with the IGO, which referred the matter to OAH for a hearing. *Id.*

An administrative law judge conducted the hearing, at which Batts, who was represented by a fellow inmate, testified on his own behalf and also called Lee as an adverse witness. *Id.*; *see also id.* at 1233. The ALJ dismissed the grievance, concluding that there was "'no credible evidence to substantiate'" Batts' claims of retaliation, and that Batts' confinement in the isolation unit had complied with DOC regulations. *Id.* at 1231 (quoting ALJ's decision). Batts filed a self-represented petition for judicial review of the final agency determination, and the Circuit Court for Baltimore City affirmed the ALJ's decision in open court. *Id.*

When Batts filed suit against Lee in federal court under § 1983, Lee asserted collateral estoppel as a defense. *Id.* The court held that Batts' federal suit was barred by the collateral estoppel effect of the ALJ's decision, reasoning that under Maryland law, preclusion principles ordinarily apply to a judgment of a court that affirms or reverses administrative determinations,

---

[15] Plaintiff's motion seeking leave to appeal the Circuit Court decision was denied by the Maryland Court of Special Appeals.    *See*    http://casesearch.courts.state.md.us/inquiry/inquiryDetail.jis?caseId=01C10034497&loc=57&detailLoc=CC.

*see id.* at 1234, and that Batts had received a "full and fair opportunity to pursue his claim in the state administrative and judicial systems." *Id.* at 1233. The court relied upon the procedural rights of prisoners in IGO grievance proceedings, *see id.*, which (then as now) provide the inmate with a right to reasonable notice of the hearing;[16] the right to appear at the hearing and represent himself or be represented by an attorney (at his own cost) or another prisoner;[17] and the right to present witness testimony and documentary evidence.[18] The court also noted that a prisoner was entitled to the creation of a record of the hearing and to a written decision of the ALJ, setting forth findings of fact and conclusions of law, which could be appealed on the record to a state circuit court, and that Batts exercised most of these rights. *Id.* at 1233. The *Batts* court found issue preclusion and granted judgment in favor of Lee.

Here - and to the extent Defendant Tichnell played any significant role in providing information used to support the Warden's decision – issue preclusion bars re-examination of the facts used by the ALJ in reaching a determination that Warden Morgan's March 25, 2010 decision denying Plaintiff placement on protective custody was not arbitrary, capricious, or not consistent with the law. This finding, however, does not bar examination as to whether Plaintiff's Eighth Amendment rights were violated with regard to the September 10, 2010 incident, nor whether Plaintiff is entitled to a single cell and protective custody status at his present location, has been harassed, or is entitled to the removal of allegedly fabricated reports from his base file.

---

[16] *See* COMAR 12.07.01.07.A.

[17] *See* COMAR 12.07.01.07.C(1).

[18] *See* COMAR 12.07.01.07.C(2)-(3).

Exhaustion of Administrative Remedies

Counsel argues that Plaintiff has not completed ARP exhaustion regarding his claim concerning the Cephus incident, his claim of denial of protective custody and single-cell status at ECI, or his allegations that corrections staff harass him by using falsified documents[19] to keep him on disciplinary segregation and by failing to properly document his concerns regarding gangs in his base file.

The Prisoner Litigation Reform Act provides, in pertinent part:

> (a) Applicability of administrative remedies
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e.

As a prisoner, plaintiff is subject to the strict requirements of the exhaustion provisions. It is of no consequence that plaintiff is aggrieved by a single occurrence, as opposed to a general conditions of confinement claim. *See Porter v. Nussle*, 534 U.S. 516, 528 (2002) (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct). Exhaustion is also required even though the relief sought is not attainable through resort to the administrative remedy procedure. *See Booth v. Churner*, 532 U.S. 731, 741 (2001). A claim which has not been exhausted may not be considered by this court. *See Jones v. Bock*, 549 U.S. 199, 220 (2007).

Administrative remedies must, however, be available to the prisoner and this court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007). The Fourth Circuit has addressed the meaning of "available" remedies:

---

[19] The court notes that throughout his papers Plaintiff has failed to specify the "false documents" to which he refers.

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. *See Aquilar-Avellaveda v. Terrell*, 478 F. 3d 1223, 1225 (10th Cir. 2007); *Kaba v. Stepp*, 458 F. 3d 678, 684 (7th Cir. 2006). Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies "in accordance with the applicable procedural rules," so that prison officials have been given an opportunity to address the claims administratively. *Id*. at 87. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

*Moore v. Bennette*, 517 F. 3d 717, 725 (4th Cir. 2008).

The PLRA's exhaustion requirement is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase*, 286 F. Supp. 2d at 530; *Gibbs v. Bureau of Prisons*, 986 F. Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process); *Booth*, 532 U.S. at 735 (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F. 3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review). Administrative remedies must, however, be available to the prisoner and this court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007). The Fourth Circuit has addressed the meaning of "available" remedies:

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. *See id.* 478 F.3d at 1225; *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir.2006). Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies   in accordance with the applicable procedural rules,   so that prison officials have been given an opportunity to address the claims administratively. *Id.* at 87. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir.2006).

*Moore v. Bennette*, 517 F. 3d 717, 725 (4th Cir. 2008). Thus, Plaintiff's remaining claims must be dismissed, unless he can show that he has satisfied the administrative exhaustion requirement under the PLRA or that Defendant Green has forfeited the right to raise non-exhaustion as a defense.[20] *See Chase v. Peay*, 286 F. Supp. 2d 523, 528 (D. Md. 2003).

Executive Director of the Inmate Grievance Office ("IGO") Scott S. Oakley avers that Plaintiff filed a grievance on November 23, 2010, IGO No. 20102287, as an "appeal" from the disposition of ARP-WCI-1969-10. (ECF No. 28-14, Declaration of Scott S. Oakley, at ¶ 3). The IGO preliminarily construed the grievance as an appeal by Plaintiff alleging he had been injured by Cephus on September 10, 2010, after he had warned staff of this possibility. *Id*. This grievance was administratively dismissed on January 14, 2011, after Plaintiff failed to provide the ARP documentation requested by the IGO showing ARP exhaustion. *Id*. Upon judicial review, and on the motion of the Commissioner of Correction, the Circuit Court for Allegany County (Leisure, J.) reversed the administrative dismissal of the grievance and remanded the

---

[20] Maryland provides a three-step grievance process:  request for administrative remedy to the Warden of the institution (commonly referred to as an ARP); an appeal of administrative dismissal to the Commissioner of Corrections; and submission of the grievance to the Inmate Grievance Office (IGO). *See Chase,* 286 F. Supp. 2d at 529.   An appeal to the IGO must be filed within thirty days following an unfavorable decision from the Commissioner. *See* Md. Code Ann., Corr. Serv. Art. §10-206 and COMAR, Title 12 § 07.01.03.

matter to the IGO "with the instruction that it again review [Plaintiff's] grievance as a case management complaint." *Id.*

On remand, the IGO construed the grievance as a complaint about a case management recommendation or decision that resulted in Plaintiff's confinement in the same cell with Cephus, culminating in the September 10, 2010 incident.  The IGO then inferred that the case management recommendation or decision that resulted in Plaintiff's confinement in the same cell with Cephus occurred prior to the assault on September 10, 2010, noted from DOC records that Cephus was assigned to  Plaintiff's cell on August 20, 2010, noted that the grievance was filed on November 23, 2010, noted the requirement of COMAR 12.07.01.05(A) that a grievance be filed within 30 days of the situation or occurrence that is the subject of the grievance (or within 30 days of when the Grievant knew or should have known of the situation or occurrence), and, by a letter dated September 13, 2011, administratively dismissed the grievance as untimely.  *Id.* A subsequent Maryland Circuit Court proceeding for judicial review was dismissed by the Circuit Court for Allegany County (Finan, J.). *Id.*

Counsel argues that this IGO determination mandates dismissal of the September 10, 2010 incident as unexhausted under the requirements of the PLRA.  This showing may not be dispositive, however, as it appears that the Department of Public Safety and Correctional Services initiated review of the incident through its Internal Investigation Unit (IIU).  (ECF No. 28-3).  The court is aware that once the IIU initiates investigation, the matter no longer is subject to the ARP process.  *See Bogues v. McAlpine, et al.*, Civil Action No. CCB-11-463 (D. Md.), ECF No. 23, Exhibit 4 at 23; *Oliver v. Harbough, et al.,* Civil Action No. ELH-11-996 (D. Md.), Memorandum of December 19, 2011, ECF No. 31 at 7-8.  Thus, Defendants' invocation of the

affirmative defense of failure to exhaust administrative remedies fails with regard to the September 10, 2010 incident involving Cephus.

Plaintiff does not rebut Defendants' assertion (ECF No. 28-13) that he has not completed ARP exhaustion regarding his claim of denial of protective custody and single-cell status at ECI, or his claims that corrections staff harass him and retaliate against him by using "false documents" to keep him on disciplinary segregation while failing to properly document his concerns regarding gangs in his base file.  Accordingly, this court will not review the merits of these claims.

<u>Failure to Protect</u>

A prisoner's right to be free from cruel and unusual punishment includes the right to be protected from a substantial risk of serious harm at the hands of other inmates.  *See Farmer v. Brennan*, 511 U.S. 825 (1994); *Winfield v. Bass*, 106 F.3d 525, 531 (4th Cir. 1997); *Belcher v. Oliver*, 898 F2d 32, 34 (4th Cir. 1990).  However, not "every injury suffered by one prisoner at the hands of another ... translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834.  A cause of action for failure to protect a prisoner from harm arises only where prison officials have been deliberately indifferent to a *known* risk of harm.  The negligent failure to protect an inmate from harm is not actionable, and complaints which do not allege deliberate indifference to a known risk of harm fail to state a claim.  *Id., see also Ruefly v. Landon*, 825 F.2d 792, 793 (4th Cir. 1987); *Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987). "[T]he protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials."  *Davidson v. Cannon*, 474 U.S. 344, 348 (1986) (negligent failure to protect from assault by other prisoner not actionable).

As in other Eighth Amendment contexts, a failure to protect claim involves an objective and a subjective component.  To satisfy the objective component, the prisoner must show that the harm he suffered was serious.  *Farmer*, 511 U.S. at 834.  He must also show that prison officials were deliberately indifferent to a substantial risk that such harm would occur. *i.e.*, that officials consciously disregard a substantial risk of serious harm.  *Id*.  Deliberate indifference in this context means that the defendant "knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Id*. at 837.  Unless the defendant actually drew the required inference, he did not act with deliberate indifference even where his actions violated prison regulations and could be described as negligent, stupid or lazy. *Rich v. Bruce*, 129 F.3d 336, 339-40 (4th Cir. 1997); *see also Verdecia v. Adams*, 327 F.3d 1171 (10th Cir. 2003) (deliberate indifference requires actual knowledge; much more than mere negligence); *Palmer v. Marion County*, 327 F.3d 588 (7th Cir. 2003) (isolated incidents of violence do not establish pervasive risk of harm).

Deliberate indifference requires advanced knowledge of a *specific* and *known* threat posed to the plaintiff, coupled with a conscious decision on the official's part to ignore the threat, resulting in serious injury to the plaintiff.  Prisons are by their nature dangerous places *generally*.  But prison officials are not "insurers of an inmate's safety." *Hughes v. District of Columbia*, 425 A.2d 1299, 1302 (D.C. 1981).

Even taken in the light most favorable to Plaintiff, no such claim is made out by the allegations of the Complaint in this case.  No evidence suggests that the fight between Plaintiff and Cephus, his cell mate, was predicated on Cephus's affiliation with prison gangs.  Plaintiff's claim that his "real enemies are being kept off [his OBSCIS enemies] list because of who they

are and their relationship to case management, Black Gorilla Family (BGF)" (ECF No. 51 at 3)

finds no support in the record.

Conclusion

The core of this action concerns whether corrections officials have taken appropriate

action to keep Plaintiff safe from gang members and in so doing have falsified reports to keep

him in disciplinary segregation and otherwise subjected him to harassment.   Defendants have

shown that Plaintiff's claims of endangerment have been adequately investigated and that he has

not been subjected to an enhanced risk of harm by gang members, fellow prisoners or corrections

staff.[21]   His disciplinary status is caused by his own actions, and the reports and investigations

that led DOC officials to determine that he is not endangered are properly reflected by records

kept within the course of prison management.   Accordingly, Defendants' dispositive Motion

shall be granted, by separate Order to follow.


Date:   September 2, 2014                                        /s/
                                                      DEBORAH K. CHASANOW
                                                      United States District Judge

---

[21] The facts clearly demonstrate that Defendants did not violate Plaintiff's constitutional rights; thus, the court need not address Defendants' qualified immunity argument.